THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
JEREMY D. MATZ (Cal. Bar No. 199401)
MICHAEL R. WILNER (Cal. Bar No. 156592)
Assistant United States Attorneys
Major Frauds Section
Telephones: (213) 894-0649/0687
Facsimile:  (213) 894-6269
Email: jeremy.matz@usdoj.gov
       michael.wilner@usdoj.gov
1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 07-755-DDP |
| Plaintiff, | **GOVERNMENT'S BENCH BRIEF IN FURTHER SUPPORT OF ADMISSION OF CO-CONSPIRATOR STATEMENTS** |
| v. | |
| JOSEPH ARAM BABAJIAN, et al., | [Fed. R. Evid. 801(d)(2)(E)] |
| Defendants. | Trial: June 9, 2009<br>       9:00 a.m. |

Plaintiff United States of America, through its attorneys of record, Assistant United States Attorneys Jeremy D. Matz and Michael R. Wilner, hereby respectfully files its Bench Brief In Further Support Of Admission Of Co-Conspirator Statements.

//
//
//
//

```
DATED: July 15, 2009           Respectfully submitted,

                               THOMAS P. O'BRIEN
                               United States Attorney

                               CHRISTINE C. EWELL
                               Assistant United States Attorney
                               Chief, Criminal Division

                               /s/
                               _____
                               JEREMY D. MATZ
                               MICHAEL R. WILNER
                               Assistant United States Attorneys
                               Major Frauds Section

                               Attorneys for Plaintiff
                               United States of America
```

ii

## I.

## INTRODUCTION

The government has presented substantial evidence of Babajian's and Grasso's participation in the conspiracy. Specifically, the government has presented and will continue to present evidence that (1) they <u>knew</u> that Abrams and Fitzgerald were fraudulently obtaining loans; and (2) they <u>took action</u> to support and assist Abrams and Fitzgerald in doing so; (3) when they acted, they had fraudulent intent; and (4) they made hundreds of thousands of dollars by doing so.  The evidence of Babajian's and Grasso's knowledge and actions earlier in the scheme speaks volumes about what they knew, what they did, and why they did it later in the scheme.  Under long-established Supreme Court and Ninth Circuit precedent, the government's evidence is more than sufficient to support a preliminary finding by the Court that Babajian and Grasso were part of the conspiracy.  Therefore, evidence of co-conspirator statements has been, and should continue to be, properly admitted.[1]

## II.

## APPLICABLE LAW

Under Federal Rule of Evidence 801(d)(2)(E), a statement is not hearsay if the statement is offered against a party and is made "by a co-conspirator of a party during the course and in furtherance of the conspiracy."  Such a statement is admissible

---

[1] In this Bench Brief, the government has not addressed the copious evidence against defendant Rizk, in light of the Court's statements that the Court would be prepared to find sufficient evidence connecting her to the conspiracy.  If the Court wishes, the government will address that evidence in a supplemental filing.

1

where: (1) the conspiracy existed at the time the statement was made; (2) the defendant had knowledge of and participated in the conspiracy; and (3) the statement was made in furtherance of the conspiracy. See United States v. Moran, 493 F.3d 1002, 1010 (9th Cir. 2007). If a statement is admissible under Rule 801(d)(2)(E), "the defendant's right of confrontation is not violated." United States v. Bridgeforth, 441 F.3d 864, 869 (9th Cir. 2006).

The government must establish each of the preliminary facts by a preponderance of the evidence. See United States v. Bowman, 215 F.3d 951, 960 (9th Cir. 2000) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). "Once a conspiracy is shown, the prosecution need only present slight evidence connecting the defendant to the conspiracy" to satisfy admission under the rule. United States v. Crespo de Llano, 838 F.2d 1006, 1017 (9th Cir. 1987) (citing Bourjaily and United States v. Mason, 658 F.2d 1263, 1269 (9th Cir. 1981)).

In rendering its decision "the district court may consider the co-conspirator's statements themselves," although those statements cannot conclusively establish the existence of the conspiracy. United States v. Torres, 908 F.2d 1417, 1425 (9th Cir. 1990). A court may also take into consideration "the nature of the scheme [and] the identity of the participants" involved. Torres, 908 F.2d at 1425. Moreover, the "quantum necessary to admit a co-conspirator statement" under the rule is necessarily lesser than that necessary to support a conspiracy conviction itself; "when considering admissibility [under the rule], sound judicial policy militates in favor of placing probative and

2

reasonably credible evidence before the trier of fact." <u>United States v. Fried</u>, 576 F.2d 787, 793 n.7 (9th Cir. 1978).

### III.
### FACTS

Here, the evidence that there was a conspiracy is overwhelming. The Court has taken guilty pleas from eight conspirators, and has heard testimony in this trial from three of them. Not even the defendants on trial contest that there was a conspiracy. Therefore, only "slight" evidence connecting Babajian and Grasso to the conspiracy is necessary to permit the introduction of co-conspirator statements. Here, the government has already presented considerably more than "slight" evidence. The government's evidence includes the following:

**A.   Defendant Babajian**

    **1.   MLS listings**

        a.   <u>Documentary Evidence</u>

The government has presented documentary evidence that Babajian entered a total of five false and inflated listings of four different homes in the Multiple Listing Service ("MLS"). (Exs. 300 (805 North Alta Drive), 6603 (1332 Summitridge), 6611 (1340 Summitridge), 7652 (1261 Angelo Drive), 7653 (1261 Angelo Drive)). With the exception of Exhibit 300, Babajian was Listing Agent # 1 (i.e., the primary listing agent) on all these MLS listings. In Exhibit 300, Babajian was Listing Agent # 2, and Grasso was Listing Agent # 1.

        b.   <u>Motive And Fraudulent Intent</u>

The government also presented evidence that Babajian entered these listings in order to perpetrate the fraud. Specifically,

3

Abrams testified that he told Babajian that the inflated listings were necessary in order to get inflated loans (e.g., RT 07/09/09 Vol. I at 17). Abrams also testified that the inflated listings were necessary to get the inflated appraisals from Rizk. (RT 07/08/09 Vol. II at 144-145). In every case, Babajian's inflated listing matched or exceeded Rizk's inflated appraisal. (Compare above-cited exhibits with Rizk appraisals at Exs. 252, 6614, 7664).

        c.   <u>Prohibition On False And Misleading Advertising In The MLS</u>

The government presented documentary evidence that the MLS prohibits false and misleading advertising. Further, the MLS makes listing agents -- here, Babajian and Grasso -- responsible for the accuracy and truthfulness of their listings. This MLS policy extends to <u>all</u> listing agents on a listing, not just Listing Agent # 1. (RT 06/25/09 Vol. III at 25-28; Ex. 29). This tends to show that Babajian's false and inflated listings were no accident or well-intentioned mistake, but rather deliberate lies that he entered into the MLS to bolster the appraisals and help obtain the inflated loans.

        d.   <u>Falsity Of 805 North Alta Drive Listing</u>

The government presented independent, non-cooperator testimony that the listing of 805 North Alta Drive (on which Babajian was Listing Agent # 2) was objectively false. This was not merely the inflated price, but also objective, black-and-white facts about the property. Specifically, the listing said that plans by Kevin Clark and permits issued by the City of Beverly Hills were available to build a 12,000-square foot

4

1 mansion. (Ex. 300). Kevin Clark testified that he never did
2 such plans. (RT 06/26/09 Vol. II at 7). A representative of the
3 City of Beverly Hills, Building and Safety Department testified
4 that there were no such permits. (RT 06/26/09 Vol. II at 66).

     e.   <u>Violation Of Seller's Directive Re: Listing</u>

6     Abrams testified that he told Babajian that Abrams and
7 Fitzgerald would only buy 805 North Alta Drive if Babajian and
8 Grasso (1) withdrew the true listing of $2,050,000; (2) relisted
9 the home at $4,495,000; and (3) reported the home sold at
10 $4,495,000. Abrams explained that he told Babajian that this was
11 necessary because otherwise, they could not get an appraisal from
12 Rizk that would be sufficiently inflated to pull the cash out
13 that they wanted to get. (RT 07/09/09 Vol. I at 28-29).

14     The government presented independent, highly corroborative
15 evidence that Babajian and Grasso did what Abrams demanded, even
16 though the seller specifically ordered them not to. The seller
17 testified that he only realized after the fact that he had signed
18 a listing agreement at $4,495,000. He was "shocked," called
19 Babajian, and made clear that he wanted the listing cancelled.
20 The seller faxed Babajian and Grasso a letter demanding that they
21 cancel the listing. (Ex. 211). Grasso sent him written
22 confirmation that they had done so. (Ex. 212). From that point
23 forward, the seller knew nothing about any higher listing. (RT
24 06/25/09 Vol. IV at 760-767; RT 06/26/09 Vol. I at 773-785).
25 However, unbeknownst to the seller, Babajian and Grasso put the
26 home back on the market at the inflated price and reported it in
27 escrow at the inflated price. Months later, after Abrams
28 demanded it, Grasso went so far as to change the sale price in

5

the MLS from the true $2,000,000 to the false $4,495,000. This was proven not only by Abrams' testimony, but also by independent, corroborative documentary evidence obtained from the MLS. (Exs. 230, 231).

   f. <u>Concealment Of Seller's Directive From Brokerage Management</u>

Babajian and Grasso presented their supervisor at Fred Sands Realtors with the phony and inflated listing agreement on 805 North Alta Drive. However, the supervisor testified that neither agent told him that the seller of the property had -- on the very day the supervisor was presented with the listing agreement -- instructed the agents to cancel the listing. Concealing this information was contrary to Fred Sands policies. (RT 07/10/09 Vol. II at 62-70).

  **2. Appraisals**

The government presented documentary evidence -- actual appraisals signed by Rizk -- that Babajian helped her inflate her appraisals by giving her bogus comps, knowing that the comps were totally dissimilar to the subject property. According to Rizk's appraisal of 805 North Alta Drive, Babajian told her that 135 Monovale Drive was "very similar" to 805 North Alta Drive. (Ex. 252). However, Babajian knew that: (1) 805 North Alta Drive was worth no more than $2,000,000 (because he had listed it for three years and had not secured any price higher than that); and (2) 136 Monovale Drive was worth $4,600,000 (because he had just sold it for that price a few weeks before). Furthermore, the government's expert witness in appraisals testified that 135 Monovale Drive was considerably larger, in a much more desirable

6

neighborhood, and had been upgraded. (RT 07/14/09 Vol. III at 39).

Additionally, Babajian gave Rizk a bogus comp -- 2600 Summitridge Drive -- for her to use in her appraisal of 1261 Angelo Drive. (Ex. 7664). Even though Babajian had represented Abrams and Fitzgerald in buying 1261 Angelo Drive for only $2,800,000 about one year prior (Ex. 7651), he then confirmed that 2600 Summitridge Drive -- with a sale price of $9,650,000, according to Rizk -- was a comp.

### 3. False Letters To Victim Lenders

The government presented documentary evidence that Babajian (and Grasso) provided a phony letter to Abrams for him to send to California National Bank to get a bogus $7,700,000 loan on the staged sale of 1261 Angelo Drive. (Ex. 7682). The letter -- bearing the signatures of Babajian and Grasso -- made false statements about a second offer to buy that home, made "while the property was under contract with another buyer." Abrams testified that the "[]other buyer" meant the straw borrower whose name was being used to purchase the home in the staged sale. (RT 07/09/09 Vol. II at 48). Abrams further testified that there was no such second offer, contrary to what Babajian and Grasso wrote. (RT 07/09/09 Vol. II at 48-49). Abrams explained that he asked Babajian and Grasso for the letter in order to provide further false justification of the home's value to the bank, and that he told them so. (RT 07/09/09 Vol. II at 47).

The letter came from Babajian's and Grasso's own files. Furthermore, the letter was faxed to Abrams. (RT 07/09/09 45-46). The government will present independent corroborative

7

evidence from AT&T that the fax number to which the letter was faxed was registered to Desert Pacific Financial -- Abrams' company.

### 4. Legal Advice

The government presented evidence from Phillip Fife -- an attorney whom Babajian consulted -- that Babajian knew that: (1) Abrams and Fitzgerald were obtaining loans higher than the true purchase prices; (2) the prices of the homes were increasing by 30 to 50 percent over a matter of weeks; (3) Abrams and Fitzgerald owned or controlled the escrow company that was frequently if not exclusively used in the deals; and (4) inflated appraisals, false financial statements, and false paperwork generated by the escrow company might be underlying the increased loans. (RT 07/07/09 Vol. II at 95-110). Furthermore, Babajian did <u>not</u> tell Fife that (1) Abrams and Fitzgerald were buying the homes for less than market value; or (2) improvements to the homes by Abrams and Fitzgerald were the reason why the prices and loans had increased. (RT 07/07/09 Vol. II at 103-106). In other words, Babajian did <u>not</u> tell Fife that the reasons for the price and loan increases he now puts forward in his defense to these criminal charges were actually the reasons.

Fife also testified that his and Alan Rubin's advice to Babajian was (1) to stop doing deals with Abrams and Fitzgerald; and (2) to disclose what they knew about the Abrams-Fitzgerald deals to law enforcement. (RT 07/08/09 Vol. I at 48-50). Rubin gave virtually identical testimony. In sum, both attorneys corroborate that Babajian knew that Abrams and Fitzgerald had been obtaining and were continuing to obtain inflated loans.

8

Needless to say, Babajian and Grasso never reported their co-conspirators to law enforcement; if they had, two years worth of fraud and tens of millions of dollars would have been avoided. Furthermore, the government has presented copious evidence that Babajian and Grasso continued doing deals with Abrams and Fitzgerald. In fact, before resting the government will present evidence that Babajian and Grasso did at least 19 additional deals -- and earned hundreds of thousands of dollars in commissions and illegitimate payments -- <u>after</u> getting legal advice from Fife and Rubin.

**5.   Title Insurance And Illegitimate Payments**

    a.   <u>Role of Title Companies in the Scheme</u>

The government has presented compelling evidence about the role that title reports and title insurance played in the fraud scheme. The Aurora representative (Carl Peterson) explained in detail why lenders require the reports and insurance from legitimate, independent title firms -- these steps are intended to assure the bank that its security interest in the property has been properly filed, insured, and that title has appropriately transferred. Mr. Peterson also testified that Aurora / Lehman received misleading title reports in connection with the issuance of millions of dollars in loans.

Abrams and Fitzgerald struggled during several periods to find title firms that would assist in the scheme. A prerequisite for the fraud scheme was finding a title firm that would: (a) handle title issues and disclose limited information to the seller in the legitimate transaction; and (b) issue insurance and reports at the fraudulent, inflated value to the lender in the

9

bogus transaction. The Court heard uncontradicted testimony from witnesses representing Southland Title (Bernadette Kane), Provident Title (Ralph Khelil), and Chicago Title (Michael Risser) that these firms refused to participate in mortgage financing deals with the Abrams-Fitzgerald organization once the firms understood the true, misleading nature of the deals.

Indeed, the significance of obtaining a complicit title company even caused Abrams to offer cash bribes to a title officer. The testimony of Mr. Risser from Chicago Title corroborates Abrams and Holland (who actually made the cash payoffs) on this crucial point. Upon the discovery of the double transactions, the multiple false title reports, and the bribe paid to a title officer, Chicago Title cancelled its services in the middle of several transactions. Ex. 5425, 5462, 7802 (cancellation letters).

       b.   <u>Babajian's Role with California Title</u>

California Title became the solution to the title problem. The Court has received numerous sales contracts, title reports, and other records showing that the Abrams-Fitzgerald organization used California Title throughout the fraud scheme, and it was the primary title firm in 2002. Babajian obtained an ownership interest in California Title when he joined Prudential California in 2001. Ex. 4409 (contract between Babajian and Prudential). While the Prudential California executive (Nyda Jones-Church) testified that she did not believe that Babajian's interest in California Title was perfected because additional contracts were not executed, there is no dispute that Babajian had a valuable interest in California Title and other firms owned by the

10

brokerage. All of Babajian's interests had sufficient value to merit a $5 million payment when Prudential was acquired the following year. According to Ms. Jones-Church, Babajian was the only real estate agent at Prudential to own such an interest.

And Babajian's interest in the title firm was no secret. Abrams and Matykowski testified that they knew Babajian partly owned and controlled California Title. Moreover, several of the real estate agents who testified at trial confirmed that Prudential California was known in the industry to own California Title.

Beginning in late 2001, Babajian and Grasso regularly wrote offers to acquire homes for the Abrams-Fitzgerald organization in which the agents specified the use of California Title on behalf of the organization. In the Claircrest transaction, the seller's agent (Tim Enright) testified that Babajian and Grasso demanded the use of California Title both in the original offer and in response to a counter-offer from the seller. Ex. 801. Other contracts in which Babajian designated his title firm, California Title, to act for the Abrams-Fitzgerald organization are also in evidence. Ex. 1001, 5403 (contracts). The only evidence before the Court regarding the designation of California Title in these contracts is because the firm was a willing participant in the fraud scheme; Babajian has offered no argument as to why his offers repeatedly select his title firm on behalf of the Abrams-Fitzgerald organization.

11

c. <u>The Threat to Cut Off Title, and the Benedict/Yoakum Transactions</u>

Given the importance of the title firm in the fraudulent deals and the overall unwillingness of legitimate title firms to participate, Babajian's subsequent actions to demand payment from the Abrams-Fitzgerald organization in return for continued use of California Title take on great significance. The Court has heard testimony that the organization was threatened with loss of access to California Title unless Babajian and Grasso were used -- or paid in lieu of use -- in transactions. Holland testified about a discussion with Bill Thomas of California Title in which Thomas stated that he could not issue title reports in deals that Babajian did not participate in. This testimony closely tracks testimony from Matykowski about an evening phone call from Grasso. In that call, Grasso similarly complained about the Abrams-Fitzgerald organization engaging in transactions and using California Title without hiring Babajian and Grasso. Abrams testified that, after his employees received this information, he reached an agreement to either use or pay Babajian and Grasso in future deals.[2]

That testimony is corroborated by the Benedict Canyon and Yoakum transactions. California Title provided the misleading title reports for these deals, which enabled the Abrams-Fitzgerald organization to obtain fraudulent loans. The unchallenged testimony -- from the independent agents who sold

---

[2] Abrams testified that his understanding was that Babajian "could stop us from getting the reports from California Title, and so by that, if we didn't use them, California Title wouldn't give us the reports the way we needed them." (RT 7/9/09, Vol. III:20).

12

the properties (Barry Sloane and Nick Segal) -- proves that Babajian played no role in the property.  The agents conclusively confirmed that Babajian did not show the properties to clients, did not participate in the contract process, and did nothing to warrant a legitimate payment.  Ex. 1601, 1801 (contracts). Additionally, settlement statements from a legitimate (that is, non-captive) escrow firm further proves that Babajian did not receive a payment from escrow in the manner that a legitimate real estate agent would.  Ex. 1606, 1806 (HUD-1 forms).

Even so, Babajian received payments from the Abrams-Fitzgerald organization.  The government has presented proof that PTD Partners (one of the group's corporate entities) paid money to Babajian for these transactions even though Babajian provided no services in connection with the purchase of the identified homes.  Ex. 1703, 1901 (checks).  These checks represented 3% of the purchase price of the homes -- and were in addition to the 4% to 6% in real commissions paid to the legitimate agents on the transactions.  Notably, these checks were made out to Prudential California and not to Babajian personally.  The government will establish through future testimony of a Prudential accountant that this enabled Babajian to claim the payments as additional income on the firm's "scorecard" regarding annual performance rankings.  Ex. 4402 (2002 annual ranking).  The government also will present testimony from an IRS agent that, but for the payments that Babajian received on the corrupt deals from the Abrams-Fitzgerald organization during 2002, Babajian would <u>not</u> have received the number one ranking in his new firm.

13

At the hearing on Wednesday, the Court observed that the payments from Abrams to Babajian could merely represent Fitzgerald's desire to shower people with money earned from the mortgage fraud scheme.  The government respectfully submits that the evidence more persuasively shows that these were intended to be illicit payments to a co-conspirator.  During his testimony, the Court heard compelling testimony that Abrams is not averse to walking away from debts, stiffing creditors, and spending his money in more selfish ways (homes, planes, vacations, jewelry, etc.).  There is no rational reason for such a greedy man to give away money to Babajian.  Rather, the more natural conclusion is that these checks represent payoffs to Babajian to allow Abrams and Fitzgerald access to California Title.  This is buttressed by the absolute lack of any evidence supporting any plausible reason that Babajian received this unwarranted compensation from the Abrams-Fitzgerald organization.

**B.    Defendant Grasso**

The government notes that virtually all (if not all) of the evidence cited above incriminates Grasso at least as strongly as Babajian.  In addition, as the Court noted, the government has presented overwhelming evidence that Grasso lied and committed fraud in the purchase of his very own home.  Tellingly, Grasso did so (1) at the outset of the scheme; (2) in collaboration with the same co-conspirators whose statements the Court has admitted (Mark Abrams and Timothy Holland); and (3) using the same modus operandi -- an inflated purchase price, an inflated appraisal, two sets of books, and a supporting letter to the bank replete with false statements.  The government presented not only Abrams'

testimony, but also documentary financial evidence, showing that Abrams fronted Grasso the money that Grasso needed to make it look -- falsely -- as if he were making a down payment.

## IV.
## CONCLUSION

For the foregoing reasons, the Court should maintain its earlier ruling that the co-conspirator statements are admissible.